Lopez, J.
This action arises out of a business dispute between the plaintiff Alden H. Kane (“Alden”) and the defendant Roger K. Kane (“Roger”), who were trustees and principal owners and operators of a family real estate business, the Kane Industrial Trust. *162 Alden filed suit against Roger seeking specific performance (Count I) and alleging breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), and breach of fiduciary duty (Count IV). The gravamen of the complaint is that Roger initiated a process pursuant to the terms of the trust whereby he was required, at the election of Alden, to either sell his shares in the trust or to buy Alden’s shares and that Roger failed to perform according to Alden’s election. Alden filed a motion for summary judgment pursuant to Mass.R.Civ.P. 56 requesting judgment in his favor on all counts. For the reasons set forth below, the motion for summary judgment is DENIED.
BACKGROUND
After a hearing and review of the motions and attendant submissions, the summary judgment record indicates the following undisputed facts.
Alden and Roger were brothers who, prior to Alden’s death operated the family businesses together for most of their professional careers. One of the family businesses and the subject of the present dispute is the Kane Industrial Trust, a real estate business that constructs and leases industrial buildings. The trust was established by declaration of trust dated March 31, 1965. The trust shares were divided into two classes, A and B, of 10,000 shares each, which carried with them equal rights. Alden owned all of the Class A shares and he and his son Michael G. Kane were the Class A trustees. Roger owned all of the Class B shares and he and his daughter Kathleen K. Adams were the Class B trustees.
Various provisions in the trust dictate the transfer of trust shares including restrictions on transfers set forth in Article 10; buyout provisions between the two classes in Article 11; and the sale of shares to unaffiliated third parties in Article 12. The Trust Declaration may only be amended in writing “by action of all of the Trustees, subject to approval thereof by the holders of a majority of the Shares of each Class outstanding, each Class voting separately.”
By 1996, the relationship between Alden and Roger had deteriorated and by 1997 the two men had stopped talking to each other. Because of the deteriorating relationship, at some point in 1996 the two brothers negotiated an amendment to the trust setting forth the terms of Article 11 specifying the mechanism by which ownership of all of the Trust’s shares could be consolidated within the family of either Alden or Roger.[1] The amendment was drafted by Attorney Peter G. Johannsen of the law firm of Sullivan & Worcester.
In late 1997 Roger contacted attorney William W. Hays (Hays) to discuss the difficulties he and Alden were experiencing. Early in 1998 Roger again contacted Hays about the growing difficulties between the brothers and sought Hays’ representation in a “business divorce.” Roger determined that he could no longer continue to work with Alden. Roger no longer trusted Alden and believed “[y]ou couldn’t take his [Alden’s] word for anything.” Hays declined to represent either brother because of a conflict of interest but ultimately agreed to attempt to mediate the dispute. After the mediation began, Roger never spoke with Alden or with any member of Alden’s family about the division of the business.
Over the course of many months in 1998, Hays mediated the communications between the two brothers. He advised them verbally and by letters as to how Article 11 functioned and he provided to them copies of Proposing Notices to execute if they so desired.[2] An appraisal was performed and a Formula Price was set.
Over the course of the mediation, Alden indicated that he “was not interested in buying” the Class B shares. Alden indicated to Hays that he was satisfied with the status quo. Alden was repeatedly queried about his interest in selling the Class A shares to Roger. Alden said to Hays on at least one occasion that he would “clean out my desk in ten minutes” for an acceptable offer to purchase his shares.
After several months of communications through Hays, Roger believed that Alden was only interested in selling, not buying, trust shares. Roger was only interested in purchasing trust shares. On November 5, 1998 Roger sent a Proposing Notice indicating his desire to purchase Alden’s shares of stock. Alden responded through his own counsel indicating that he intended to take his full 60 days allowed under the agreement to weigh his options thereunder and this response was confirmed and relayed to Roger by Hays via a letter dated November 9, 1998. Roger, on November 16, 1998, upon learning that Alden was not promptly agreeing to sell the Class A shares to Roger, sent a memorandum to Alden stating that he was rescinding and withdrawing his Proposing Notice.[3]
On December 30, 1998, the “election date,” Alden delivered to Roger Kane a Notice of Election electing to cause the Trust to purchase the Roger’s shares. Alden then deposited $100,000 in escrow on January 15, 1999.[4] Roger failed to tender his shares to Alden within the 120 days provided under the Trust or at any time thereafter.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17.
*163 A. Article 11 of the Trust: Buy/Sell Right
The premise for Alden’s claims is that Article 11 of the Trust required Roger to sell his shares in the trust to Alden within 120 days of his receipt of Alden's Notice of Election. Roger’s failure to tender his shares) therefore, gave rise to the breach of contract and attendant claims articulated in his complaint. Accordingly, the meaning of Article 11 of the Trustmust be ascertained.
Neither party disputes that the trust governs the transfer of the trust shares or the specific transaction which is the subject of this dispute. The issue lay first, in the interpretation of the terms of Article 11. The interpretation of the terms of Article 11 is an issue of law and therefore within the province of this court. See Lumber Mutual Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995).
Established principles of contract law dictate that we construe the terms of a contract to give reasonable effect to its provisions and to yield a rational business document which manifests the intent of the parties. See McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264 (1962). In doing so, the interplay of other phraseology within the document must be considered so as to produce a workable and harmonious interpretation. See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 794 (1986). An omission, however, cannot be supplied merely by conjecture but rather must be supported by sufficient declaration in the instrument as a whole and the underlying intention. Spaulding v. Morse, 322 Mass. 149, 152-53 (1948). An issue raised on defense is Roger’s ability to rescind his Proposing Notice.
Unlike the typical situation of two businesses at odds over the term of a contract under which goods have been delivered or services have been performed— course of performance — this dispute revolves around the meaning of terms not heretofore exercised. The plain meaning of the written provision and the understanding of the parties are both helpful in understanding the terms and the intent. See Jamesbury Corp. v. Worcester Valve Co., 443 F.2d. 205, 212 (1971). See also 5 Corbin on Contracts §24.16 (“The practical interpretation of a contract may thus be evidenced by the parties’ acts or by their words”). The understanding of the brothers concerning the meaning and operation of Article 11 may be discerned from the ongoing negotiations of the “business divorce” as represented in both deposition testimony and correspondence between Hays and the two brothers.
A review of the plain language of Article 11 reveals a process whereby the shareholders wishing to initiate a transaction of trust shares send a “Proposing Notice” to the “other shareholders” requiring the other shareholders to choose between either selling their shares to the proposer, buying the proposer’s shares, or causing the trust to buy the shares, at or greater than the “formula price.”[5] The decision of which option to elect must be made by the “other shareholders” within sixty (60) days after receipt of the proposing notice or, by default, they will be deemed to have elected to sell their shares. Nothing in Article 11 provides for recission of a Proposing Notice.
Apparent in the record is that this explanation had been relayed to both brothers at the time the amendment was drafted and filed in 1995, and later during the period in 1998 when Hays attempted to mediate the problems between the two brothers. Indeed, Hays’ letter to both brothers sent at the outset of his tenure as mediator, April 22, 1998, interprets Article 11 in similar terms. The letter indicates that “(a)ction by each party is mandatory” and “(t]he other cannot ignore the Notice.” Subsequent letters indicate the same interpretation. Roger, in his deposition, acknowledged this interpretation of Article 11 and admitted that the risk of issuing a proposing notice is that the other stockholder has the option to either buy or sell regardless of the proposer's desire.
Based on the plain language of Article 11, the intent inferred from the original drafting and explanation of the provisions, and the interpretation of counsel to the parties prior to Roger’s issuance of the proposing notice this court interprets Article 11 to set forth a procedure to affect the transfer of shares between the shareholders as follows: (1) one party makes abinding, non rescindable proposal to transact trust shares at a stated price greater than or equal to the “formula price” which, then (2) requires the party receiving the proposal to respond within sixty days (3) by electing either to buy the proposed shares or to sell her shares or to cause the trust to buy the shares in question. The receiving party’s failure to respond results in a deemed sale by the receiving shareholder of her shares to the proposing shareholders or the trust. No power to rescind a proposing notice exists; once an Article 11 procedure is instigated by sending of a proposing notice, action by each of the parties is mandatory.
B. Breach of Contract Claim
Based on the foregoing interpretation of the Article 11 buy/sell provision by this court, Roger’s Notice of Rescission of Roger’s proposing notice had no effect. Roger’s subsequent failure to perform — tender the Class B shares — would necessarily be deemed a breach of the contract created when Alden returned his Notice of Election electing to have the Trust purchase the Class B shares.
Roger responds in his answer with a variety of affirmative defenses and counterclaims much of which mimics the claims made by Alden with the addition of a claim for fraudulent misrepresentation. The thrust of Roger’s defense argument on this motion involves the fraudulent misrepresentation of Alden that he would sell the Class A shares to Roger.
Fraudulent misrepresentation may be predicated on present intention as to future conduct if the statements misrepresent the actual intention of the *164 speaker and were relied upon to the detriment of the recipient. See McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709, and cases cited. In McEvoy, the plaintiff argued fraudulent misrepresentation by the defendant which induced the plaintiff to sign a contract. The defendant fraudulently represented that it would not exercise its rights under a certain provision in the contract which was detrimental to the plaintiff. Id. at 708. Some months after the plaintiff signed the contract, the defendant exercised its rights under the subject provision. Id. The court found that such representations, if proven, adequately support a finding of fraud. Id. at 715-16.
Although I find that Article 11 contained no provision for rescission of a proposing notice, the fact that Roger attempted to rescind immediately upon learning of Alden’s intent to “consider all of his options” bears on the understanding and reliance of Roger on the representations that Alden would sell the Class A shares upon offer of the formula price. Alden counters that the record is clear on his intent and that his representations to Hays were truthful and that he never specifically said that he would sell his shares. The course of events during the time period of November 5, 1998 to November 16, 1998, adequately illustrates the disparity in the material facts of this case relevant to Alden’s intentions when he made statements to Hays and Roger’s claims of misrepresentation. The depositions of the two brothers in conjunction with that of Attorney Hays create a picture of great animosity between Alden and Roger and a confused communication of information such that the intent of the parties statements cannot adequately be determined by the court based on deposition transcripts alone.
Alden, citing Cataldo Ambulance Service, Inc. v. Chelsea, 426, Mass 383, 387 (1998), would have the court determine whether Roger’s reliance on Alden’s communications were reasonable as a matter of law. That case is distinguishable from the facts at hand. In Cataldo the parties were sophisticated parties dealing at arms length. Id. Cataldo had acknowledged during negotiations the inapplicability of the statute it thereafter rested its case upon. Id. Here, the parties are hardly arms length negotiators, being brothers in excess of 60 years of age, long-time business partners, and well experienced in the reactions of each other. As discussed above, I will not judge as a matter of law the reasonableness of Roger’s reliance on Alden’s communications based only on deposition transcripts.
Based on the foregoing discussion, I cannot find that no genuine issue material fact in dispute exists in this case and accordingly I must deny summary judgment.
C. Breach of the Covenant of Good Faith and Fair Dealing and Breach of Fiduciary Duty
Alden also contends that the trust contained an implied covenant of good faith and fair dealing which Roger breached by his failure to perform and his attempted repudiation of his Notice of Proposal. Likewise Roger’s actions and his defenses are the basis for Alden’s claim of breach of fiduciary duty to the holders of the Class A and B shares. As discussed above the record amply displays the disparity of the facts in this case. These facts are no less clear as they pertain to the remaining claims, defenses and counterclaims. Further, the resolution of the underlying breach of contract claim bears directly on these additional claims.
ORDER
For the foregoing reasons the court orders that the plaintiff Alden H. Kane's motion for summary judgment is DENIED.

 Article 11 provides in pertinent part:
The holders of Class A shares acting as a class or the holders of Class B Shares acting as a Class (the “Proposing Class") may at any time by notice (the “Proposing Notice") to the holders of the other Class of Shares (the “Other Class") require the holders of the Other Class to elect either to sell for cash all of the shares of the Other Class to the shareholders of the Proposing Class or to the trust or to purchase or cause the Trust to purchase for cash all of the Shares of the Proposing Class from the Shareholders of the Proposing Class, for a price per share in either case equal to the price per share stated in the Proposing Notice (the “Stated Price Per Share"), provided that the Stated Price Per Share may not be lower than the Formula Price per Share then in effect (or as determined pursuant to Section 14 if there is no Formula Price per share then in effect). The decision to present a Proposing Notice and whether the Shares are to be purchased by Shareholders or by the Trust and the determination of the Stated Price per share shall be made by the Trustees elected by the Shareholders of the Proposing Class (the “Proposing Class Trustees") with the approval of the holders of a majority of the Shares of the Proposing Class.
The decision by the Other Class whether to buy or sell or cause the Trust to buy shall be made by written notice from the Trustees elected by the Other .Class (the “Other Class Trustees") to the Proposing Class Trustees given within sixty days after receipt of the Proposing Notice (the “Notice of Election"). Such decision shall be made by the Other Class Trustees with the approval of the holders of a majority of the Shares of the Other Class. In the absence of a Notice of Election given within said sixty-day period by the Other Class Trustees, the Shareholders of the Other Class shall be deemed to have elected to sell their Shares of the Other Class to the Shareholders of the Proposing Class or to the Trust, as set forth in the Proposing Notice
The Purchasing Shareholders who shall have approved such purchase shall, within twenty days after the delivery (or deemed delivery) of the Notice of Election (in either case, the “Election Date”) deposit One Hundred Thousand Dollars ($100,000) in a bank account established by such Purchasing Shareholders, or established by such Purchasing Shareholders on behalf of the Trust, as the case may be, for the benefit of the Selling Shareholders, in order to insure performance by such Purchasing Shareholders or the Trust, as the case may be . . .

 The following are excerpts from letters from Hays to both Alden and Roger:
“The one who initiates the process does so by giving the other party a Notice which sets forth the price at which the *165 initiator wishes to sell his stock or buy the other's stock . . . The other party then has 60 days in which to accept the offer to purchase his stock, or must himself purchase the stock of the initiator for the price listed in the Notice . . . Action by each party is mandatory . . . The other cannot ignore the Notice. If he does not respond within the 60 days then it is deemed that the other accepts the proposal in the Notice.” (April 22, 1998);
“Once the other party receives this "Proposing Notice," he has 60 days to either accept the offer to purchase or to sell by sending a “Notice of Election” ... if the other party fails to respond within the 60-day period, then under the Agreement the other party is deemed to have agreed to sell his shares . . ." (August 4, 1998);
“If either of you wishes to buy the stock of the other or to sell your own stock in the trust then you should prepare the appropriate (Purchase or Sale) ‘Proposing Notice,’ copies of which I previously sent you . . . Please keep in mind that once the "Proposing Notice" is sent the process takes on a certain compulsory nature." (August 24, 1998).

 Roger’s memorandum stated, “I hereby RESCIND and WITHDRAW my PROPOSING NOTICE to you dated November 5, 1998 to buy for cash all of your shares of stock in Kane Industrial Trust for the total price of $3,576,498.75. This recission and withdrawal is made prior to my receipt of your NOTICE OF ELECTION pursuant to the Kane Industrial trust Amended and Restated Declaration of Trust dated May 29, 1996.

 Art. 11 of the Trust provides, “The Purchasing Shareholders who shall have approved such purchase shall, within twenty days after the delivery of the Notice of Election, deposit One Hundred Thousand Dollars ($ 100,000) in a bank account ... for the benefit of the Selling Shareholders, in order to insure performance by such Purchasing Shareholders or the Trust, as the case may be.”

 The formula price is set by an appraisal procedure not at issue in this case. The Proposing Notice must be, at a minimum, for the formula price.